IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERNEST N. JOHNSON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMTRAK, | : | No. 08-4986 |
| Defendant. | : | |

MEMORANDUM

Schiller, J.                                                                                                June 26, 2009

Plaintiff Ernest Johnson, a disgruntled former Amtrak passenger who suffers from diabetes and colitis, asserts that Defendant National Railroad Passenger Corporation ("Amtrak") discriminated against him in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") during a May, 2006 round trip from Philadelphia, Pennsylvania to Albuquerque, New Mexico. Currently before the Court is Amtrak's motion for summary judgment. For the following reasons, the motion is granted.

I.    BACKGROUND

Plaintiff purchased tickets for a May, 2006, round trip from Philadelphia, Pennsylvania to Albuquerque, New Mexico for a vacation. (Def.'s Statement of Undisputed Facts [hereinafter Def.'s SOF] ¶¶ 12, 14; Pl.'s Ans. and Resp. to Def.'s Statement of Facts [hereinafter Pl.'s SOF] ¶¶ 12, 14.) At the time of this trip, Plaintiff was a fifty-eight year old diabetic who also suffered from colitis; he continues to suffer from these ailments. When Plaintiff reserved tickets by phone, he informed the Amtrak representative of his diabetes and colitis, and requested a "handicapped spot" with "[a] bathroom, sleep accommodations, [and] three meals a day." (Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16;

Rankin Decl. Ex. A [Pl.'s Dep.] at 73-74.)  Plaintiff also confirmed that the sleeper compartments had a private bathroom.  (Pl.'s Dep. at 77.)  Although he remembers explaining his conditions to the Amtrak representative, Plaintiff could not recall stating that he needed a diabetic diet.  (Def.'s SOF ¶ 18; Pl.'s SOF ¶ 18; Pl.'s Dep. at 211.)

Although Plaintiff requested a sleeper compartment with a private bathroom for every leg of his trip, sleeper compartments were not available for the Philadelphia to Pittsburgh leg of his outgoing trip and the New York to Philadelphia leg of his return trip.  (Pl.'s Dep. at 77, 105, 177-78; Everson Decl. ¶ 9 & Ex. C [System Timetable Spring-Fall 2006].)  Plaintiff therefore did not pay for a sleeper for the Philadelphia to Pittsburgh leg of his trip, since no such compartment was available.  (Pl.'s Dep. at 105.)  He acknowledged that he "knew they wasn't gonna have a sleeper [on that leg], 'cause they told me that." (*Id.*)  Regarding the New York to Philadelphia leg, Plaintiff "[didn't] really know if they provided a sleeper" because of the short distance of the trip.  (*Id.* at 177-78.)

Plaintiff's tickets indicate that, instead of booking a sleeper for the Philadelphia to Pittsburgh leg of his outgoing trip and the New York to Philadelphia leg of his return trip, he reserved an "access coach" ticket, which offered him more space than a regular seat.  (Everson Decl. ¶ 8 & Ex. B [Pl.'s Tickets]; Rankin Decl. Ex. B [Pl.'s Ticket Stubs].)  Amtrak's records reflect that Plaintiff was not charged extra money for sleeper accommodations for these legs of his trip.  (Everson Decl. Ex. A [Pl.'s Reservation and Travel History] at NRPC0142 ll. 37-57.)  Since Plaintiff notified Amtrak of certain back, neck and knee injuries, Amtrak gave him a 15% discount off his rail fare and sleeper accommodation charges because he was a "mobility impaired passenger." (Everson Decl. ¶¶ 4, 8 & Ex. A at NRPC0141 & Ex. B; Pl.'s Dep. at 75.)  However, Plaintiff stated that he never

2

received this discount. (Pl.'s Dep. at 81-82.) The total cost of the tickets was $2,695.94. (Everson Decl. Ex. H [Letters from Pl.'s Attorney to Amtrak].)

At the time of Plaintiff's Amtrak trip, Plaintiff's diabetes treatment included oral medication and a regulated diet. (Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4.) He was also required to check his blood sugar levels and use diabetic equipment to regulate his diabetes. (Dinoto Decl. Ex. A [Letter from Dr. Ahmed].) Other than avoiding foods with sugar, Plaintiff could not recall the specifics of his diet plan, other than generally noting that "[i]t has to be a very healthy diet, you know, vegetables, things of that nature." (Pl.'s Dep. at 37-39, 207.) Although Plaintiff was not taking insulin at the time of his trip, he currently injects himself with insulin twice a day to care for his diabetes. (*Id*. at 36, 42, 204.)

Plaintiff was, and still is, on medication for his colitis; he also has certain dietary restrictions and must use the restroom after every meal. (Def.'s SOF ¶ 6; Pl.'s SOF ¶ 6; Pl.'s Dep. at 45-46, 209; Pl.'s Ex. B [Prescription Blank from Dr. Cohen].) However, Plaintiff could not identify any specific foods that he was required to avoid as a result of his colitis. (Pl.'s Dep. at 46.)

Plaintiff consulted his diabetes and colitis doctors prior to his trip. (*Id*. at 50.) Plaintiff could not remember his doctors' instructions in specific detail, but recalled that they were intended to help him "eat properly:"

> I have to eat three meals a day. I have to eat on time. You know, instructions of that nature. I have to eat a certain time of day and I can't eat after certain hours. So I have to stay on a — you know, a regular — my regular diet, you know, breakfast, lunch and dinner. That was the purpose for me getting a sleeper.

(*Id*. at 50.) Plaintiff also testified at his deposition that he needed a sleeper because he requires access to a bathroom and food, and he "need[s] the space to get around in." (*Id*. at 63.)

3

Although Plaintiff likes to fish and go to the movies, he cannot partake in those activities as much because of his diabetes and colitis. (*Id*. at 52-53.) This is in part because diabetes "takes a lot of [one's] energy." (*Id*. at 54.) However, Plaintiff's conditions do not prevent him from driving. (*Id*. at 56, 60.) Indeed, he drives himself to doctors appointments that are up to forty minutes away and travels approximately once a year. (*Id*. at 46-47, 58.) Additionally, Plaintiff is capable of taking his medication without assistance and does not need assistance going to the restroom. (*Id*. at 229.) Plaintiff eats out at restaurants "every now and then," even though the restrooms in those restaurants may be a "walking distance" away. (*Id*. at 65, 67). Plaintiff testified at his deposition that his "whole life has changed" as a result of his diabetes and colitis, but was unable to offer any specifics as to the manner in which it has changed. (*Id*. at 55-56.)

On May 3, 2006, Plaintiff embarked on the first leg of his Amtrak trip. He was scheduled to travel on train number 43 from Philadelphia to Pittsburgh, but a derailment damaged the tracks on the Pittsburgh line. (Rankin Decl. Ex. B; Everson Decl. Ex. D [Derailment Report].) Accordingly, Amtrak terminated service on the 43 train at Harrisburg and bused all of the passengers, including Plaintiff, the remainder of the distance to Pittsburgh. (Def.'s SOF ¶ 23; Pl.'s SOF ¶ 22; Everson Decl. Ex. D.) There was a restroom on the bus, which Plaintiff used a few times, despite describing it as "messed up" and "hard to use." (Pl.'s Dep. at 103.) At some point during the trip the bus stopped at a rest stop. Plaintiff ate at the rest stop and again in Pittsburgh at a restaurant "around the corner" from the train station. (*Id.* at 109; Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25.)

On the Pittsburgh to Chicago and Chicago to Albuquerque legs of Plaintiff's outgoing trip, Plaintiff was provided with the sleeper compartments with private bathrooms that he had paid for, and had access to bathroom facilities and food. (Def.'s SOF ¶ 26; Pl.'s SOF ¶ 26.) Plaintiff also ate

4

food at a restaurant in Chicago "outside of the train station" while waiting for his connection to Albuquerque. (Def.'s SOF ¶ 27; Pl.'s SOF ¶ 27.) Plaintiff has no complaints concerning these legs of his trip. (Pl.'s Dep. at 120, 125.)

While on vacation in Albuquerque, Plaintiff rented a car, ate at local restaurants and went site seeing. (Pl.'s Dep. at 129-30.) Specifically, Plaintiff visited the zoo and historical sites such as churches. (*Id.*) Plaintiff did not have any physical problems during his stay in Albuquerque. (*Id.* at 131.)

Plaintiff was scheduled to depart Albuquerque on May 12, 2006 on train number 4, but while train number 4 was en route to Albuquerque, a trespasser ran in front of the train and was killed, delaying the train. (Everson Decl. ¶ 12 & Ex. B & Ex. F [Amtrak Status Report] at NRPC 0122.) Plaintiff received a call from Amtrak regarding the train's status. (Def.'s SOF ¶ 30; Pl.'s SOF ¶ 30.) Although Amtrak's records reflect that the call informed Plaintiff that his train would be delayed and advised him to call Amtrak's 800 number for updates on the train's departure time, Plaintiff claims that he was merely told to arrive at the train station at a particular time. (Everson Decl. ¶ 6 & Ex. A at NRPC0141; Pl.'s Dep. at 131-33.)

When Plaintiff arrived at the Albuquerque train station, the Amtrak representatives there reported that the train was delayed. (Pl.'s Dep. at 135-36.) The train station's bathroom was out of order, so Plaintiff and the other passengers who were waiting were required to use the bathroom next door.[1] (Def.'s SOF ¶¶ 35, 37-38; Pl.'s SOF ¶¶ 37-38; Pl.'s Dep. at 138-39, 141-42, 148; Everson Decl. ¶ 5 & Ex. A at NRPC0141 ll. 55-58.) Plaintiff used the nearby facilities at least three or four

---

[1] The Albuquerque train station is owned by the Burlington Northern Santa Fe Railroad, not Amtrak. (Everson Decl. ¶ 16.) Amtrak pays a monthly fee to the Burlington Northern Santa Fe Railroad to maintain the station. (*Id.*)

times.  (Def.'s SOF ¶ 44; Pl.'s SOF ¶ 44.)

At some point during the wait, Plaintiff began feeling weak, "like he was going to pass out." (Pl.'s Dep. at 149.)  Plaintiff relayed to Amtrak's district manager that he suffered from diabetes and colitis, that he "was getting very ill" because he had not eaten, and that he required frequent and immediate use of restrooms because of his condition.  (*Id*. at 138, 152; Def.'s SOF ¶¶ 39-41; Pl.'s SOF ¶ 39.)  According to Plaintiff, he had not eaten because there "was nowhere to eat."  (Pl.'s Dep. at 143.)  Plaintiff requested that Amtrak "put him up" at a hotel until the train arrived, but Amtrak did not do so.  (*Id*. at 152.)

Amtrak's records reflect that Amtrak offered to call EMS or seek other medical assistance for Plaintiff, but that he refused these offers.  (Everson Decl. Ex. A at NRPC0142.)  Furthermore, Amtrak's Customer Relations Report reflects that an Amtrak representative advised Plaintiff to eat at one of the nearby restaurants, but Plaintiff refused because "they were all Mexican and he did not eat Mexican food."  (Everson Decl. Ex. G [Customer Relations Report] at NRPC0119.)  Amtrak's records also reflect that Plaintiff was offered a refund and a cab to the airport, but that he refused this offer as well.  (Everson Decl. Ex. A at NRPC0142 & Ex. G at NRPC0119.)  In contrast, Plaintiff testified at his deposition that he was never offered medical assistance and that Amtrak did nothing in response to his complaints.  (Pl.'s Dep. at 143-44.)

Ultimately, the train was delayed twelve hours.  (Def.'s SOF ¶ 29; Pl.'s SOF ¶ 29.)  The delay inconvenienced all of the passengers who were waiting for the train, many of whom, according to Plaintiff, were "angry" and "upset."  (Pl.'s Dep. at 151-52; Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32.)

Once he was on the train, Plaintiff received the sleeper compartment that he paid for.  (Pl.'s Dep. at 156-57.)  Because of the late hour, no food was available when the train departed.  (*Id*. at

156.) However, Plaintiff later had breakfast and lunch on the train. (*Id*.) Plaintiff felt sick on this train ride — his stomach was "messed up" and he was "light-headed all the time." (*Id*. at 159.) Additionally, Plaintiff experienced bleeding when he went to the bathroom. (*Id*. at 160.)

The next leg of Plaintiff's trip was from Chicago to New York. On this leg, Plaintiff received the sleeper compartment with private bathroom for which he paid. (Pl.'s Dep. at 170.) Although Plaintiff still felt sick on this leg of the trip, he used the bathroom and had access to food. (*Id*. at 170, 175.) Plaintiff continued to feel sick on the final leg of his trip, from New York to Philadelphia. (*Id*. at 178-79.) He has no complaints about this final leg other than the fact that he was not provided with a sleeper. (*Id*. at 176-77.)

Plaintiff asserts that his colitis and diabetes worsened as a result of his trip on Amtrak. (*Id*. at 180.) He claims that the trip "deteriorated [his] health," and has caused him to develop depression. (*Id*. at 194, 198.)

Plaintiff, through his attorney, contacted Amtrak to complain that he did not receive the special accommodations for which he had paid, and to request a refund of the entire purchase price of his tickets. (Everson Decl. Ex. H [Letters from Pl.'s Attorney to Amtrak].) After investigating the matter, Amtrak concluded that Plaintiff had, in fact, received the sleeper compartments for which he paid. (Everson Decl. Ex. I [Sept. 15, 2006 Letter from Everson to Dinoto].) Nevertheless, Amtrak extended Plaintiff an apology for the delay in Albuquerque and gave him a $300.00 transportation certificate for future travel on Amtrak. (*Id.*) Plaintiff has since used this certificate, at least partially, on a subsequent trip with Amtrak. (Def.'s SOF ¶ 49; Pl.'s SOF ¶ 49.)

Plaintiff then filed the Complaint in this case, which Amtrak removed to this Court on October 21, 2008. He asserts that Amtrak discriminated against him in violation of the ADA and

7

RA when he was refused special accommodations for which he paid during his May, 2006 trip.[2] (Compl. ¶¶ 3, 6, 12, 14-15, 18.) Plaintiff also alleged that Amtrak "deliberately overbooks its special accommodations in order to collect extra money and then deliberately denies those special accommodations to handicapped individuals such as the Plaintiff, who need those special accommodations in order to travel comfortably." (Id. ¶ 30.)

Plaintiff's subsequent discovery responses reveal that his lawsuit is primarily based on: (1) the fact that Plaintiff did not receive a sleeper compartment on the Philadelphia to Pittsburgh leg of his outgoing trip and was thus forced to use "regular accommodations" on the train and the bus and (2) the fact that Amtrak, "[r]ather than putting the Plaintiff in a hotel or adequately providing for him in light of his disabilities[,] . . . forced [Plaintiff] to wait in the [Albuquerque] train station" without "appropriate bathroom facilities" or "a good restaurant so that he could have access to food." (Rankin Decl. Ex. D [Def.'s First Set of Interrogs. and Pl.'s Resps.] at Nos. 4, 9, 12-13, 18.) Plaintiff's response to the instant motion for summary judgment also asserts a new theory — that Amtrak failed to abide by a consent decree in an unrelated case.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party

---

[2] The Complaint also purports to be based on the Federal Civil Rights Act of 1964, the Constitution of the Commonwealth of Pennsylvania and Pennsylvania statutes, however, Plaintiff has abandoned those claims at this stage of the litigation, as his response to the instant motion relies solely on the ADA and the RA.

does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S.133,150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

**III.    DISCUSSION**

Title II of the ADA prohibits public entities, including Amtrak, from discriminating against disabled individuals. 42 U.S.C. §§ 12131(1)(C), 12132 (2009) ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). The RA prohibits exclusion of a disabled individual, solely because of his disability, from any program or activity receiving federal funds. 29 U.S.C. § 794.

To make out a prima facie case of discrimination under Title II of the ADA, a plaintiff must demonstrate: "(1) she is a qualified individual with a disability; (2) she was either excluded from or otherwise denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits or

discrimination was by reason of the plaintiff's disability." *McCree v. Se. Pa. Transp. Auth.*, Civ. A. No. 07-4908, 2009 WL 166660, at *11 (E.D. Pa. Jan. 22, 2009); *Spieth v. Bucks County Housing Auth.*, 594 F. Supp. 2d 584, 591 (E.D. Pa. 2009); *Yudenko v. Guarini*, Civ. A. No. 06-4161, 2008 WL 4055826, at *9 (E.D. Pa. Aug. 27, 2008); *Webber v. Pa. Bd. of Probation and Parole*, Civ. A. No. 03-1600, 2006 WL 581197, at *3 (M.D. Pa. Mar. 8, 2006), *aff'd*, 199 F. App'x 186 (3d Cir. 2006). The standards governing ADA claims and RA claims are essentially the same, and the Court will therefore analyze these two claims together. *See Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 207 n.11 (3d Cir. 2008); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4, 302 (3d Cir. 2007) (analyzing ADA and RA claims together despite acknowledging differing language affecting the "causative link between discrimination and adverse action") (internal quotations omitted); *see also* 42 U.S.C. § 12133.

### A. Plaintiff is Not Disabled as Defined by the ADA and RA

Pursuant to the ADA, an individual is disabled if he (1) has "a physical or mental impairment that substantially limits one or more of [his] major life activities;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment."[3] 42 U.S.C. § 12102(2) (2008); *see also Webber*, 2006 WL 581197, at *3 (noting parallel definition for disability under RA). Plaintiff asserts that his diabetes and colitis render him disabled under the first prong of this definition.

To satisfy the ADA's first definition of disability, a plaintiff must have (1) a physical or mental impairment; (2) that substantially limits; (3) one or more of the plaintiff's major life

---

[3] This provision was amended, effective January 1, 2009. ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C. § 12102 (2009)). Because the alleged discrimination against Plaintiff occurred prior to that date, the earlier version of the statute applies. *See Amorosi v. Molino*, Civ. A. No. 06-5524, 2009 WL 95259, at *4 n.7 (E.D. Pa. Mar. 19, 2009).

activities. A physical impairment is "'[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194-95 (2002) (quoting 45 C.F.R. § 84.3(j)(2)(i) (2001)), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Major life activities "refers to those activities that are of central importance to daily life," *id.* at 197, and includes "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii); *see also Toyota Motor Mfg.*, 534 U.S. at 195. A plaintiff is "substantially limited" if he cannot "'perform a major life activity that the average person in the general population can perform'" or if he is "'[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Toyota Motor Mfg.*, 534 U.S. at 195-96 (quoting 29 C.F.R. § 1630.2(j) (2001)).

A court should consider the nature, severity, duration, and permanent or long-term impact of the impairment in assessing whether it substantially limits plaintiff in a major life activity. *Id.* "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Id.* at 198. Furthermore, the Supreme Court has held that the determination of whether an individual is disabled under the ADA must take into account any corrective measures "that mitigate the individual's impairment." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 482 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). In other words, when an impairment is corrected by

mitigating measures, "it does not 'substantially limi[t]' a major life activity." *Id.* at 483 (alteration in original). Disability must be assessed on a case-by-case basis, as it is an individualized inquiry. *Toyota Motor Mfg.*, 534 U.S. at 198; *Sutton*, 527 U.S. at 483.

Plaintiff's diabetes and colitis clearly constitute physical impairments. The question, then, is whether Plaintiff has adduced sufficient evidence that his diabetes and/or colitis substantially limit his ability to engage in any major life activity. In answering this question, this Court must consider the effects of Plaintiff's medication and other measures he uses to mitigate the effects of his diabetes and colitis.

Plaintiff makes no effort to establish that his conditions substantially limit a major life activity. In his response to Defendant's motion, he asserts that he is disabled because (1) he must check his blood sugar, use diabetic equipment, take medication and regulate his diet to control his diabetes and (2) he must eat a "special diet" and use the restrooms after every meal because of his colitis.[4] (Pl.'s Mem. of Law in Supp. of Pl.'s Ans. to Def.'s Mot. For Summ. J. [hereinafter Pl.'s Mem.] at 1.) He does not identify any major life activity that these disorders might limit. Although Plaintiff has produced documentation evidencing that he currently receives Social Security disability

---

[4] Plaintiff also asserts that he is disabled by virtue of certain back, neck and knee injuries he sustained prior to being diagnosed with diabetes and colitis. The Complaint does not mention these injuries and, having previously limited discovery on Plaintiff's medical conditions to those raised in his Complaint, i.e., his diabetes and colitis, this Court will not entertain this newly raised claim. Apr. 8, 2009 Order (Doc. No. 15) ¶ 1 (limiting production of medical records in Plaintiff's Social Security file to those "related to those disabilities alleged in Plaintiff's Complaint"); *see also* May 11, 2009 Order (Doc. No. 16) ¶ 1 (requiring Plaintiff to produce authorizations allowing for discovery of records in Plaintiff's Medicare file "related to those disabilities alleged in Plaintiff's Complaint.") Furthermore, in response to an interrogatory requesting that Plaintiff identify the "physical condition which you allege qualifies you for protection under the [ADA] and/or [RA]," Plaintiff identified only his diabetes and colitis. (Rankin Decl. Ex. D [Def.'s First Set of Interrogs. and Pl.'s Resps.] at No. 1.)

benefits and his disabled person identification card from the state of New Jersey in order to establish that he is disabled, these documents do not reflect how Plaintiff's diabetes and/or colitis substantially limit any major life activity. (Pl.'s Ex. C [Disabled Person ID & Letter from the Social Security Administration].) Indeed, Plaintiff receives disability payments in connection with his back, neck and knee injuries, not because of his diabetes or colitis, so this information is irrelevant to the disability inquiry regarding those conditions. (Pl.'s Mem. at 3; Pl.'s Decl. ¶¶ 4-5; Pl.'s Dep. at 20-22, 25-27.) Regardless, "[t]he definition of disability under the Social Security program differs from the definition of disability under the ADA, such that receipt of Social Security benefits does not necessarily establish that a person is 'a qualified individual with a disability' within the meaning of the ADA." *Lloyd v. Washington & Jefferson College*, 288 F. App'x 786, 788 n.1 (3d Cir. 2008) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-05 (1999) and 42 U.S.C. § 12112(a)).

Furthermore, the evidence in this case establishes that Plaintiff is not, in fact, substantially limited in any major life activity due to his diabetes or colitis. Although Plaintiff's diabetes compels him to eat a healthy, sugar-free diet and regular meals, check his blood sugar, take medication or insulin, and periodically visit doctors, these do not constitute substantial limitations. Plaintiff is capable of taking care of himself — he does not need assistance taking his medications, he can drive himself to doctors appointments, and he is capable of traveling across the country on his own for a vacation. Plaintiff was also capable of eating at local restaurants in Albuquerque, consistent with his habit of eating out at restaurants "every now and then" when he is not on vacation.

The fact that Plaintiff is required to take medication, monitor his blood sugar and attend doctors visits because of his diabetes does not render him substantially limited in the ability to care

for himself. *See McPherson v. Fed. Express Corp.*, 241 F. App'x 277, 282-83 (6th Cir. 2007) ("The fact that [plaintiff, an insulin dependent diabetic,] needed to check his blood sugar regularly and to attend medical appointments does not establish that he was substantially limited in his ability to . . . care for himself."). Furthermore, Plaintiff's need to eat a healthy, sugar-free diet, without specific restrictions, does not substantially limit him in the major life activity of eating. Compared to an average member of the general population, many of whom frequently eat out at restaurants, but who may avoid certain foods either for health reasons or personal preference, Plaintiff's dietary restrictions cannot be considered substantially limiting. *See Shultz v. Potter*, 142 F. App'x 598, 599 (3d Cir. 2005) (summary judgment warranted on RA claim because plaintiff, a diabetic, could not establish that her ability to eat was substantially limited: plaintiff's condition "merely requires her 'to watch what she eats more carefully,' have a snack if her blood sugar is low, and take insulin if it becomes too high"); *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1156 (11th Cir. 2005) ("Many people have to monitor their food intake for health and lifestyle reasons, and avoiding 'mostly sugars' is not 'significantly restricted' for this purpose."); *Lewis v. Pennsylvania*, 609 F. Supp. 2d 409, 416-17 (E.D. Pa. 2009) (plaintiff, a type II diabetic, was not substantially limited in ability to eat or metabolize food because he avoided sweets, cut salt out of his diet and checked his blood sugar occasionally). The need to eat three meals a day at regular intervals also fails to qualify as a substantial limit on a major life activity. *See Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1002 (S.D. Tex. 1997) ("While [plaintiff, a diabetic,] must eat at regular intervals, this does not rise to a protected ADA disability; it merely means that he must monitor his food intake closer than some persons.").

Since Plaintiff's diabetes does not substantially limit his ability to engage in any major life

activity, summary judgment is appropriate on his ADA and RA claims based on his diabetes. *See Hughes v. City of Bethlehem*, 294 F. App'x 701, 705 (3d Cir. 2008) (affirming summary judgment for defendant on ADA claim because Plaintiff "present[ed] no evidence demonstrating that, because of her type II diabetes, she is substantially limited in the types of activities that are of central importance to daily life") (internal quotations omitted); *see also Sutton*, 527 U.S. at 483 (indicating that a "[a] diabetic whose illness does not impair his or her daily activities" should not be considered disabled "simply because he or she has diabetes").

Likewise, Plaintiff cannot establish that his colitis substantially limits a major life activity. Although Plaintiff's colitis requires him to take medication, visit doctors, eat a certain diet and use the restroom after every meal, his condition does not prevent him from taking care of himself, as he can drive, travel, and even eat out at restaurants as described above. Indeed, Plaintiff has no problem eating at restaurants where he is "a walking distance away" from the restrooms. Furthermore, although Plaintiff might have preferred a more conveniently located restroom, he was capable of using the restroom around the corner from the Albuquerque train station without incident. Plaintiff has not established that his colitis substantially limits any major life activity so as to render him disabled under the ADA or RA. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) (plaintiff was not disabled because her symptoms of colitis, although permanent and, on occasions severe, "vary in intensity, and are almost absent outside the summer"); *see also Sacay v. Research Found. of the City U. of N.Y.*, 193 F. Supp. 2d 611, 629 (E.D.N.Y. 2002) ("[M]erely needing to be near a bathroom is not a limitation that rises to the level of severity, frequency and duration required for a finding of disability under the ADA"). Accordingly, summary judgment is appropriate on Plaintiff's ADA and RA claims based on his colitis.

Since Plaintiff has not established that either his diabetes or his colitis render him disabled under the ADA and the RA, his claims fail.

### B. Lack of Evidence that Amtrak Discriminated Against Plaintiff

Even assuming that Plaintiff is disabled under the ADA and RA, he has adduced no evidence that he was treated differently from any other passenger traveling on Amtrak or that Amtrak discriminated against him based on his diabetes or colitis. The fact that Plaintiff was inconvenienced because he was bused to Pittsburgh and delayed in Albuquerque is not evidence that Amtrak discriminated against him at all, let alone because of his disability. Furthermore, this treatment, which resulted from a trespasser fatality and track damage respectively, was bestowed upon *every other passenger* scheduled to travel on those trains. Plaintiff himself admits this. (*See* Def.'s SOF ¶¶ 32, 37-38; Pl.'s SOF ¶¶ 32, 37-38; Pl.'s Dep. at 101-03.) Travel delays are inconvenient and frustrating, but they do not constitute ADA or RA violations.

Furthermore, Plaintiff received all of the accommodations for which he paid. Although Plaintiff did not have a sleeper on two of the legs of his round trip (Philadelphia to Pittsburgh and New York to Philadelphia), Plaintiff acknowledged that sleepers were not available on those trains and Amtrak's records reflect as much.[5] Indeed, Plaintiff's tickets for those two legs indicate that he purchased "access coach" tickets, in contrast to the tickets for other legs of Plaintiff's trip, which indicate that he purchased a sleeper. There is no evidence that Plaintiff was charged additional fees for sleeper accommodations on these legs of his trip and Plaintiff himself admitted that he did not pay for sleeper accommodations for the Philadelphia to Pittsburgh leg. (Pl.'s Dep. at 105.)

---

[5] Plaintiff's response to the motion to summary judgment and his discovery responses do not mention the New York to Philadelphia leg of the trip, which suggests that Plaintiff has also abandoned any complaints with respect to this leg of the trip.

The record is devoid of any evidence that Plaintiff was discriminated against based on his diabetes or colitis. As such, summary judgment is warranted. *McCree*, 2009 WL 166660, at *12 (granting summary judgment when plaintiff proffered "no evidence to support an inference that [defendant's agent] acted intentionally, [or] that [defendant's agent] acted by reason of Plaintiff's disability"); *see generally Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" that amounts to "more than a mere scintilla" and may not "simply reassert factually unsupported allegations").

Without evidence of discrimination based on disability, Plaintiff was not entitled to a reasonable accommodation, let alone a hotel room on demand. *See Spieth*, 594 F. Supp. 2d at 591 ("[O]nly after a plaintiff has established a prima facie case of disability discrimination must the court undertake a reasonable accommodation analysis.") Thus, even resolving the disputed facts concerning Amtrak's alleged failure to accommodate Plaintiff in Albuquerque in Plaintiff's favor, these facts are irrelevant because Plaintiff cannot establish discrimination.

### C.  Plaintiff's Accessibility Claim

There is also no merit to Plaintiff's accessibility-related claims. Plaintiff alleges that Amtrak violated the ADA and related regulations by "fail[ing] to have handicapped facilities at its railway station in Albuquerque, New Mexico sufficient to accommodate the Plaintiff." (Pl.'s Mem. at 12.) First, Amtrak does not own the Albuquerque train station. (Everson Decl. ¶ 16.) Even if Amtrak were responsible for the condition of the Albuquerque train station, however, the fact that the bathroom was under construction, thereby requiring travelers to use a bathroom around the corner from the station, does not violate the ADA or related regulations. *See* 49 C.F.R. § 37.161(c)

("[I]solated or temporary interruptions in service or access due to maintenance or repairs" does not violate the ADA). Furthermore, nothing in the ADA or related regulations require Amtrak to operate "good restaurants" in its train stations.

        **D.**      **Plaintiff's Overbooking Claim Fails**

Plaintiff's Complaint asserts that Amtrak "deliberately overbooks its special accommodations in order to collect extra money and then deliberately denies those special accommodations to handicapped individuals such as the Plaintiff, who need those special accommodation in order to travel comfortably on AMTRAK as do members of the general public." (Compl. ¶ 30.) Plaintiff has abandoned this theory on summary judgment. Nevertheless, as discussed above, Plaintiff received all of the accommodations for which he paid.

        **E.**      **Plaintiff's Newly Raised Consent Decree Theory**

In his response to Amtrak's motion to dismiss, Plaintiff accuses Amtrak of violating a consent decree entered in the matter of *Ferreyra v. Amtrak*, Civil Action No. 96-2704, in the Northern District of California. Plaintiff asserts that, as a mobility impaired passenger, he was entitled to certain protections incorporated in the consent degree, such as a discount on his fare and notice of Amtrak's policies pertaining to handicapped individuals, that he did not receive during his May, 2006 travels. (Pl.'s Mem. at 2-3.)

As a preliminary matter, Plaintiff's Complaint does not mention the consent decree nor the alleged violations that Plaintiff now presses and Plaintiff has not moved to amend his Complaint to include such allegations. Furthermore, even if Plaintiff could establish a violation of this consent decree, which is highly unlikely, he cannot assert his claim here because the appropriate venue for raising such a claim is the Northern District of California, not this Court. (Dinoto Decl. Ex. E

[Consent Decree] at 5, ll. 11-13 ("The Court [which entered the consent decree] shall have continuing jurisdiction to enforce the Decree, to effectuate its purposes, and to grant supplemental relief as may be appropriate."); *id.* at 12, ll. 5-9 ("[I]solated incidents of alleged non-compliance with this Decree by Amtrak that do not reflect a pattern of non-compliance by Amtrak shall not constitute a breach of this Consent Decree.").)  Accordingly, this claim is dismissed.

## IV.   CONCLUSION

Plaintiff is clearly disappointed with his May, 2006 Amtrak trip.  But he has failed to establish that he is a disabled individual or that he was discriminated against by virtue of a disability.  Accordingly, summary judgment is warranted.  An appropriate Order will be docketed with this Memorandum.